# EXHIBIT C




**Las Vegas Office**
11920 Southern Highlands Parkway, Suite 103
Las Vegas, NV 89141
(702) 468-0808
epglawyers.com

**NED M. GELHAAR**
ngelhaar@epglawyers.com

April 27, 2023

**VIA EMAIL ONLY**

Mark Peters
Managing Member
RCM Settlements, Inc.
759 Poinsettia Park
Encinitas, CA 92024
Email: mdavidpeters@gmail.com

**Regarding: Captive: Sunrise Indemnity, Inc.**
**Insured: RCM Settlements, Inc.**
**Claim Number: CL-SRI-2022-001**
**Date Reported: April 20, 2022**
**Policy: SRI-PISCD-2022**
**Policy Period: September 22, 2021 – September 21, 2022**

Dear Mr. Peters:

As you are aware, this firm represents Synergy Captive Strategies, LLC ("Synergy") with regard to the above referenced claim ("Claim") under Sunrise Indemnity, Inc. Personal Injury Settlement Contract Default Policy Number SRI-PISCD-2022 issued to RCM Settlements, Inc. ("Insured" or "RCM") for the period September 22, 2021 – September 21, 2022 ("Policy").

We have analyzed the information available to Synergy, including the Policy, the materials previously submitted by Insured, and the Criminal Indictment filed on March 29, 2023, in *United States of America v. Arthur Wade Beasley*, D. Nev. Case No. 2:23-cr-00066-JAD-DJA ("Federal Indictment"). Having done so, we regret to inform you that the Policy does not provide coverage to Insured with respect to the Claim for the reasons stated below.

## I. RELEVANT BACKGROUND

Insured submitted a Preliminary Claim Report to Synergy dated April 20, 2022 ("Preliminary Report") along with several Attachments, including Attachment "A" titled "Detailed Description of Incident ("Detailed Description"). In the Preliminary Report, Insured described its loss as follows:

Nature of Loss: Fraud and/or conversion
Fair Market Value: $1,500,000

Cost to Repair or Replace: $1,500,000
Amount of Damages Incurred: $1,500,000

We will be filing a lawsuit against J&J Consulting, J&J Purchasing and Beasley Law Group and all other identified individuals and companies. We will also be filing as victims of the Ponzi scheme with the FBI . . ..

As pertinent here, Insured further stated in its Detailed Description:

In 2021, RCM Settlements, LLC [sic.] ("RCM") started making loans to Beasley Law Firm, Matthew Beasley, J & J Consulting, J & J Purchasing, and Jeffery Judd ("the Beasley Group") as part of a personal injury settlement advancement investment program ("the Beasley Program"). RCM has been adding funds to the Beasley Program for 6 months.

The Beasley Program was an investment program that used investments from RCM to make advances to personal injury clients on settlements of their cases. Settlement advances to clients were made in $100,000.00 increments. A number of times, RCM invested in multiple settlements with a single payment.

The Beasley Program paid returns between 15% and 19% quarterly on each $100,000.00 loan. The amount of return paid to RCM depended upon what was negotiated between the parties for each $100,000.00 investment.

Investments were made for a 90-day period. The principal investment was rolled over every quarter.

Until March 3, 2022, no payments had ever been missed by the Beasley Group. However, the last payment received by RCM from the Beasley Group was for $30,000.00 on January 18, 2022. No payment has been made since.

It was not until March 10, 2022, that RCM was notified that Matthew Beasley, the individual, admitted he had been involved in a Ponzi scheme with RCM's (plus hundreds of other people's) money. See Attachments B1-B4, which are newspaper articles that were published in the Las Vegas Review Journal, and Attachment D, Justin Spiegel's email notification, also with newspaper article attached.

Since 2021, RCM loaned the Beasley Group a total of $2,200,000.00 and never withdrew any of the principal investment. RCM received a PPM Memorandum with an amount denoting $2,200,000.00 had been invested on its behalf in the Beasley Program (Attachment C). The total amount RCM invested is covered across one insurance captive with two insurance contracts. RCM has these two insurance contracts with Sunrise Indemnity, each for $1,500,000.00. Additionally, per the RCM – MRRV Services Agreement (Attachment F), any unused insurance capacity is assigned to MRRV per the terms of the services agreement.

> As mentioned above, on March 10, 2022, RCM was notified that Matthew Beasley, the individual, had been arrested and confessed to orchestrating a Ponzi scheme in the amount of at least $300,000,000.00, which included the money RCM invested in the Beasley Program. See attached news articles. Since before that date, no interest payments had been received, and requests made to Jeffery Judd, the individual, about unpaid payments went unanswered.
>
> Existing news articles (Attachments B1-B4) establish that Matthew Beasley, the individual, knowingly and falsely, made misrepresentations of a material fact to RCM and other investors, i.e., that Matthew Beasley, the individual, represented that advanced payments were made to individuals secured by their personal injury settlements. In fact, NO SUCH PAYMENTS WERE EVER MADE NOR DID ANY CLIENTS EXIST! The Beasley Program was simply using new investment funds to pay old investors. RCM relied to their detriment upon Beasley's misrepresentations. In the newspaper articles, Matthew Beasley, the individual, NUMEROUS TIMES CONFESSED that he had orchestrated the Ponzi scheme. Hundreds of people apparently have lost hundreds of millions of dollars.
>
> This case has made national news and there will be lawsuits and more articles revealing more facts and possibly more individuals or entities that were involved, which RCM will endeavor to collect and provide, and include in their lawsuit.
>
> RCM will also be attempting to get police investigation reports. RCM will be filing as a victim of the Ponzi scheme with the FBI. RCM has also joined a class action lawsuit against Wells Fargo, the bank the Beasley Group was using for its operations (Attachment E).
>
> RCM has no other insurance coverage that covers any of the losses caused by this Ponzi scheme.
>
> Thus, it is established that, based upon the submitted attachments and documents (plus any other later submitted materials), that Beasley falsely made a misrepresentation of a material fact to RCM to carry out his Ponzi scheme. Furthermore, RCM has suffered monetary damages to the full policy limits of this agreement with Sunrise Indemnity for both contracts.

Attachments B1 – B3 to the Preliminary Report are a series of online articles from the *Las Vegas Review-Journal* including, as pertinent here: (1) a March 5, 2022 article which reported that "[t]he Federal Bureau of Investigation is looking for potential victims of a Ponzi scheme that operated for five years in Nevada;" (2) a March 7, 2022 article reporting that Matthew Beasley had been shot by FBI Agents the prior Thursday, March 3, 2022, after they came to his home to investigate involvement in a Ponzi scheme; and (3) a March 8, 2022 article reporting that Beasley had "repeatedly confessed" to operating a Ponzi scheme and that he expected agents to come to his home on March 3, 2022, because "the FBI had visited an associate earlier."

Attachment C to the Preliminary Report includes a Private Placement Memorandum ("PPM") listing Insured as a potential investor in J & J Purchasing, LLC. The PPM is signed by Chad Barron on behalf of Insured on December 30, 2021, with an effective date of January 1, 2022. As pertinent here, the PPM states on its cover page "THE MINIMUM SUBSCRIPTION INVESTMENT UNDER THIS OFFERING IS EIGHTY THOUSAND DOLLARS ($80,000.00) (THE "MINIMUM OFFERING AMOUNT") AND UP TO THE MAXIMUM SUBSCRIPTION INVESTMENT OF FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) (THE "MAXIMUM OFFERING AMOUNT")."

Attachment C to the Preliminary Report also includes a document titled "ADDENDUM TO J AND J PURCHASING, LLC CONFIDENTIAL SUBSCRIPTION AGREEMENT" signed by Chad Barron as Subscriber and Mark Peters as Investor Representative of Insured as of January 31, 2022 ("Addendum"). As pertinent here, the Addendum states: "the Subscriber elects to invest . . . in accordance with the minimum set out in the PPM and . . . with a total Principle cash investment of $2,200,000."

Attachment E to the Preliminary Report is a document titled "Attorney Representation Agreement" dated March 11, 2022, relating to a potential class action lawsuit against J and J Consulting Services, Inc. and others ("Class Action Agreement"). Although it is unclear whether he document relates to Insured or to another entity, in the "Investor Information" section of the agreement, the document states: "Total Amount Invested: $11,380,000," and "[a]mount received from J&J: < $6M."

Attachment F to the Preliminary Report is a document titled "Business Service Agreement between MRRV Investments, LLC ("MRRV") and RCM Settlements, LLC ("RCM") Regarding Payment of Insurance Premium and Use of Insurance Coverage" executed June 5, 2021 ("Business Service Agreement"). As pertinent here, The document provides that "MRRV has the initial right to utilize RCM's insurance coverage capacity until RCM is fully subscribed . . .."

As noted above, on March 29, 2023, the Federal Indictment was filed in the United States District Court for the District of Nevada. The Federal Indictment alleges in pertinent part as follows:

1. Defendant Matthew Wade Beasley was licensed to practice law in the State of Nevada.

2. Defendant Beasley conducted a Ponzi scheme, that is, Beasley solicited (and caused to be solicited) investors to invest in fake investment contracts, then used money from new investors to pay interest on purportedly maturing investments owed to earlier investors.

3. It was part of the scheme and artifice that Beasley conducted and caused to be conducted the activities stated in paragraphs 4 through 13 below, among others.

4. Beginning no later than in or about 2017, Beasley falsely and fraudulently represented to Individual-1 that he could find plaintiffs in personal injury lawsuits

who wanted to borrow money against their pending settlements with insurance companies and were willing to pay high interest rates to borrow the money for 90 days.

5. Beasley arranged for Individual-1 to loan money to purported personal injury plaintiffs and created fake contracts (known as "Purchase Agreements") between Inidividual-1 and the purported personal injury plaintiffs.

6. Beasley caused Individual-1 to find investors to invest in the Purchase Agreements between Individual-1 and the purported personal injury plaintiffs.

7. Beasley created contacts between Individual-1 and the investors (known as "Investments Agreements") regarding the investments in the Purchase Agreements between Individual-1 and the purported personal injury plaintiffs.

8. As the number of investors greatly multiplied, Beasley caused Individual-1 to recruit several investors to become "promoters" to help Individual-1 recruit new investors and manage their investments in the Purchase Agreements.

9. Beasley made and caused Individual-1 and promoters to make the following material misrepresentations, among others, to induce investors to invest in Purchase Agreements:

   a. Beasley had access to personal injury plaintiffs who wanted to borrow money against their settlements with insurance companies and would pay high interest rates to borrow money for 90 days;

   b. Beasley had arranged for Individual-1 to lend money to personal injury plaintiffs, and Beasley drafted the Purchase Agreements between personal injury plaintiffs and Individual-1;

   c. Investors could invest in Purchase Agreements;

   d. Investments were available in $80,000 or $100,000 increments;

   e. Investments lasted 90 days and returned high rates of interest;

   f. At the end of 90 days, Beasley would receive principal and interest payments from personal injury plaintiffs and would send them to Individual-1 and promoters who would distribute them to investors;

   g. Investors could reinvest in new Purchase Agreements; and

   h. The investments carried no apparent risk because personal injury plaintiffs always paid the principal and interest on time.

10. Beasley caused investors to wire transfer their investments to Beasley's IOLTA account (a bank account set up by an attorney to hold client monies) and to promoters who wire transferred the investments to Beasley's IOLTA account. Beasley used new investor money to pay interest and return principal to earlier investors to create the illusion that personal injury plaintiffs existed, were borrowing money from Individual-1, and were repaying the loans with interest.

## II. PERTINENT POLICY PROVISIONS

The Policy's Declarations state that its Effective Date is January 20, 2022, its Expiration Date is January 19, 2023, and its Initial Effective Date is January 20, 2022. The Declarations further state that the Policy's Per Occurrence Limit of Liability is $100,000 and its Aggregate Limit of Liability is $1,500,000.[1] The Policy contains the following provisions that are particularly pertinent to our claims analysis.

I. DEFINITIONS

A. Aggregate Limit of Liability shall mean the most that **Company** will pay under this **Policy**, regardless of the amount of **Covered Loss**. The Aggregate Limit of Liability is specified in the Declarations.

B. Broker shall mean a broker of a **Purchase Agreement** who is party to a contract or agreement with **Insured** pursuant to which a portion of the **Buyer's Interest** is payable to **Insured**.

C. Buyers Interest shall have the meaning set forth in the **Purchase Agreement.**

. . .

F. Covered Event shall mean the failure of a **Broker** to deliver to **Insured** all or a part of the agreed-upon portion of the **Buyer's Interest** in connection with a **Purchase Agreement** due to:

1. The occurrence of an **Event of Default**; or

2. Fraud and/or conversion by the **Broker**, the **Broker's** attorney, or an escrow agent. A Covered Event shall be deemed to first occur at the time that **Insured** is aware that an **Event of Default** has occurred or at the time that **Insured** discovers the fraud and/or conversion.

G. Covered Loss shall mean the amount of the **Buyer's Interest** that is due and unpaid to **Insured** under the **Purchase Agreement**. Covered Loss shall also include costs sustained by **Insured** in resolving the litigant's obligation to

[1] Insured submitted two Preliminary Reports and states in its Detailed Descriptions that it is insured under two separate Personal Injury Settlement Contract Default insurance policies. Synergy has no record of a second such policy being issued to Insured.

pay the **Buyer's Interest** to **Insured**, including but not limited to attorney's fees.

. . .

I. Effective Date shall mean the Effective Date specified in the Declarations of this **Policy**.

J. Event of Default shall have the meaning set forth in a **Purchase Agreement**.

. . .

M. Initial Effective Date shall mean the Initial Effective Date specified in the Declarations of the **Policy**.

N. Insured shall mean any person, partnership or organization named as an **Insured** in the **Declarations** or by an endorsement to this **Policy**.

. . .

P. Per Occurrence Limit of Liability shall mean the Per Occurrence Limit of Liability specified in the Declarations of this **Policy**.

. . .

R. Purchase Agreement shall mean an agreement between a **Broker** and a litigant, pursuant to which such litigant has transferred an interest in litigation proceeds to **Insured** in exchange for a purchase price.

. . .

III. INSURING AGREEMENT

A. Subject to the limits, conditions and exclusions contained in this **Policy**, and to any **Deductible**, **Company** will reimburse **Insured** the amount of **Covered Loss** arising from any **Covered Event** that first occurs during the **Policy Period** and is reported in accordance with Section V of this **Policy** during the **Policy Period** or **Extended Reporting Period**, if applicable.

. . .

IV. LIMITS

A. In no event shall the amount paid by **Company** to **Insured** with respect to any **Covered Event** exceed the amount listed as the **Per Occurrence Limit of Liability** in the Declarations of this **Policy**. A **Covered Event** affecting multiple **Insureds** shall be treated as a single **Covered Event**. Multiple **Covered Events** arising out of the same transaction, occurrence, facts or circumstances will be treated as a single **Covered Event**.

. . .

VI. EXCLUSIONS

This **Policy** does not apply to any Covered Loss related to or caused directly or indirectly by:

A. any actions taken by **Insured**, individually or in concert with others, intended by **Insured**, or that can be expected from the standpoint of a reasonable person to cause a **Covered Loss** to **Insured**;

B. any fact, circumstance, situation, transaction, event, or claim, which, as of the **Initial Effective Date**, **Insured** knew or reasonably should have known would be likely to result in a **Covered Event**;

. . .

IX. GENERAL PROVISIONS

A. No Third Party Beneficiary. The provisions of this **Policy** are solely for the benefit of **Insured** and **Company** and their respective assigns and may be enforced only by Insured and Company and their respective assigns. There are no third-party beneficiaries to this **Policy**. **Company** will make no payments to any party other than **Insured**, and no party other than **Insured** shall have the right to enforce the obligation of **Company** to make any payments to **Insured.**

. . .

G. Concealment, Misrepresentation and Fraud.

1. Any fraud, misrepresentation, or concealment with respect to information provided with respect to the reporting of a **Covered Event** or **Covered Loss** pursuant to Section V of this **Policy** shall render this **Policy** void.

2. If this **Policy** is voided pursuant to Section IX.G.1, **Company** will retain any premium paid, and **Insured** will be liable to refund to **Company** any payments **Company** may have made under this **Policy.**

. . .

I. Assignment. No **Insured** may assign any of its interest in or rights under this **Policy** without the prior written consent of **Company**.

. . .

## III. COVERAGE POSITION

As pertinent here, the Policy's Insuring Agreement provides that "**Company** will reimburse **Insured** the amount of **Covered Loss** arising from any **Covered Event** . . .." As pertinent here, "**Covered Loss**" is defined to mean "the amount of the **Buyer's Interest** that is due and unpaid to **Insured** under the **Purchase Agreement**." "Purchase Agreement," in turn, is defined as "an agreement between a **Broker** and a litigant, pursuant to which such litigant *has transferred an interest in litigation proceeds* to **Insured** in exchange for a purchase price (emphasis added)."

As Insured acknowledges in the Detailed Description submitted to Synergy, and as confirmed in the Federal Indictment, no litigations ever existed. As a result, there were not -- and never could have been -- any agreements pursuant to which an interest in litigation proceeds was transferred. The use of the past tense "has" in the term "has transferred" in the Policy's definition of "Purchase Agreement" requires the existence of an agreement pursuant to which an actual past transfer of an ownership interest in litigation proceeds has occurred. Absent actual litigation, there could be no transfer of an interest in litigation proceeds and therefore no "Purchase Agreement" under the terms of the Policy.[2]

Since "**Covered Loss**" in the Insuring Agreement means "the amount of the **Buyer's Interest** that is due and unpaid to **Insured** *under the **Purchase Agreement**[,]* (emphasis added)," there can be no Covered Loss because there is no Purchase Agreement and therefore no amount due and unpaid under it. Moreover, there can be no "Buyer's Interest" since the term is defined to have the meaning used in the "Purchase Agreement" as that term is defined in the Policy, and no such agreements ever existed.

The absence of a "Purchase Agreement" as the term is defined in the Policy also establishes that there was no "Covered Event" as is required for coverage under the Insuring Agreement. As pertinent here, "Covered Event" is defined to mean "the failure of a **Broker** to deliver to **Insured** all or a part of the agreed-upon portion of the **Buyer's Interest** in connection with a **Purchase Agreement** . . .." Again, because there were no Purchase Agreements and therefore no "Buyer's

[2] Although Beasley apparently created sham documents titled "Purchase Agreement" in furtherance of his Ponzi scheme, no "interest in litigation proceeds" was transferred pursuant to such sham agreements so they did not constitute Purchase Agreements as the term is used in the Policy.

Interest" in them, there could be no failure to deliver an agreed upon portion of the Buyer's Interest.

In sum, the absence of agreements pursuant to which an interest in litigation proceeds was transferred establishes that there were no "Purchase Agreements" as the term is defined in the Policy, and therefore no "Covered Loss" or "Covered Event" as required under the Insuring Agreement for coverage under the Policy.[3]

Although there is no potential for coverage under the Policy, we take this opportunity to identify other provisions of the Policy that would also limit or preclude coverage relating to the Claim. Paragraph IV.A of the Policy states in pertinent part: "In no event shall the amount paid by **Company** to **Insured** with respect to any **Covered Event** exceed the amount listed as the **Per Occurrence Limit of Liability** in the Declarations of this **Policy**. . . . Multiple **Covered Events** arising out of the same transaction, occurrence, facts or circumstances will be treated as a single **Covered Event**." As Insured acknowledges in the Detailed Description submitted to Synergy, all of its alleged losses arose out of its ongoing participation for 6 months in what Insured calls the "Beasley Program," which Insured and the Federal Indictment assert was a Ponzi scheme that had been in continuous operation since 2017. As such, Insured's alleged losses from Beasley's Ponzi scheme arose from the same transaction, occurrence, facts and/or circumstances. Thus, even if coverage of the Claim were available under the Policy, it would be limited to the Per Occurrence Limit of Liability, $100,000.[4]

Paragraph VI.A. of the Policy states in pertinent part: "This **Policy** does not apply to any **Covered Loss** related to or caused directly or indirectly by . . . any actions taken by **Insured**, individually or in concert with others, intended by **Insured**, or that can be expected from the standpoint of a reasonable person to cause a **Covered Loss** to **Insured.**" As noted above, Insured took actions which appear to have been intended to increase its losses related to Beasley's Ponzi scheme, and/or which would be expected from the standpoint of a reasonable person to do so. These actions include, but are not limited to: (1) investing in the Beasley Program beyond the

---

[3] Synergy's records include an exchange of emails in 2021 relating to revision of the definition of the term "litigant" to include a Broker and a Broker's attorney. Since our analysis turns on the fact there was no litigation and therefore no transfer of an interest in litigation proceeds, there would be no coverage under the Policy whether the additional language was included or not.

[4] As discussed above, "Covered Loss" under the Policy means "the amount of the Buyer's Interest that is due and unpaid to Insured under the Purchase Agreement," and "Buyer's Interest" has "the meaning set forth in the Purchase Agreement." Since there were no Purchase Agreements as the term is defined in the Policy, there was no "Buyer's Interest" and consequently no "Covered Loss." Further, even under the sham document titled "Purchase Agreement" used to further Beasley's Ponzi scheme, "Interest" was defined to mean an interest "in the Proceeds" of litigation, and "Proceeds" was defined to mean the amount of an agreed upon settlement of a personal injury lawsuit less various deductions such as attorney's fees due under a fee agreement. So even under the definitional terms of the sham agreement, Insured would have no "Covered Loss" under the Policy because there were no "Proceeds" of litigation and therefore no "Buyer's Interest" in them. Moreover, under the sham agreement, the "Interest" sold by the litigant was limited to the amount of the settlement in the litigant's litigation -- which was zero since no litigation existed. Again, even under the terms of the sham agreement, there could be no "Covered Loss" under the Policy. Finally, Insured states in the Detailed Description that "The Beasley Program paid returns between 12% and 19% quarterly . . .," and that "the last payment received by RCM from the Beasley Group was for $30,000.00 on January 18, 2022." Thus, the interest payments actually received by Insured would in many if not most cases have exceeded the false "Settlement Amounts" stated in the sham agreements as well as the amounts invested by Insured.

limits stated in the PPM; and (2) investing in the Beasley Program after a reasonable person would realize the program was fraudulent. Thus, even if coverage were available under the Policy, any such coverage could be limited or excluded.

Paragraph VI.B. of the Policy states in pertinent part: "This **Policy** does not apply to any **Covered Loss** related to or caused directly or indirectly by . . . any fact, circumstance, situation, transaction, event, or claim, which, as of the **Initial Effective Date**, **Insured** knew or reasonably should have known would be likely to result in a **Covered Event**." The Initial Effective Date of the Policy was September 22, 2021. As noted above, Insured sought to broaden the definition of the term "litigant" in 2021, potentially showing awareness prior to the Initial Effective Date of facts, circumstances, situations, transactions, and/or events suggesting that the Beasley Program was fraudulent and/or unstable, and could likely result in losses relating to it. Thus, even if coverage were available under the Policy, any such coverage could be limited or excluded because of such awareness.

Paragraph IX.B. of the Policy states in pertinent part: "The provisions of this **Policy** are solely for the benefit of **Insured** and **Company** and their respective assigns and may be enforced only by **Insured** and **Company** and their respective assigns." Paragraph IX.I. of the Policy states: "No **Insured** may assign any of its interest in or rights under this **Policy** without the prior written consent of **Company**." As noted above, Insured entered into the Business Services Agreement which appears to have been intended to extend coverage under the Policy to third parties without permission. Thus, even if coverage were available under the Policy, any such coverage could be limited or excluded because of such unauthorized effective assignments.

Paragraph IX.G. of the Policy states in pertinent part: "Any fraud, misrepresentation, or concealment with respect to information provided with respect to the reporting of a **Covered Event** or **Covered Loss** pursuant to Section V of this **Policy** shall render this **Policy** void." Insured's Detailed Description and materials submitted with it implicate this Exclusion, including but not limited to the Assignments and Addendum which appear to have been prepared and/or executed after the date Insured discovered that the Beasley Program was a Ponzi scheme in an effort to obtain and/or extend coverage under the Policy. Further, we have observed anomalies with respect to the dates of creation and execution of documents submitted with Insured's Claim. Thus, even if coverage were available under the Policy, the Policy could be voided and/or any coverage under the Policy could be limited or excluded because of such conduct.

## IV. CONCLUSION

For the reasons stated above, the Policy does not provide coverage related to the Claim. Synergy reserves its right to supplement its coverage position upon receipt of additional information. Synergy expressly reserves its right to assert additional defenses under the Policy, under any additional policies issued to the Insured, or at law, as events warrant. The failure to cite additional language of the Policy and/or of any additional policies issued to the Insured does not preclude Synergy from raising other defenses in the future. Nothing in this or any other

communication serves to waive Synergy's rights under the Policy or otherwise, and Synergy recognizes that Insured's rights are also reserved.[5]

Sincerely,

**ENENSTEIN PHAM & GLASS LLP**

By:______________________________
Ned M. Gelhaar, Esq.

---

[5] We believe that this letter should sufficiently address the questions and requests you have made in previous emails, and/or demonstrate why they are not relevant to the coverage determination. Should you still have any specific questions that pertain to the coverage determination and/or particular documents you would like copies of, please let us know.