# EXHIBIT D

# HEATON | FONTANO
## ATTORNEYS AT LAW

Salt Lake City Office:
222 South Main Street, 5th Floor
Salt Lake City, UT 84111

**JONATHAN W. HEATON**
O: 801-253-3305 | F: 702-763-7385
jon@heatonfontano.com

Las Vegas Office:
7285 Dean Martin Dr Ste 180
Las Vegas, NV 89118

March 27, 2024

Via Email Only

Robert A. Rabbat, Esq. (rrabbat@epgrlawyers.com)
Ned M. Gelhaar, Esq. (ngelhaar@epgrlawyers.com)
Neeloufar Mahrouyan, Esq. (nmahrouyan@epgrlawyers.com)
ENENSTEIN PHAM GLASS & RABBAT LLP
11920 Southern Highlands Parkway, Suite 103
Las Vegas, NV 89141

*Re:    Claims Against Synergy Captive Strategies, LLC*

Dear Counsel:

As you know from my previous correspondence dated December 27, 2023, this law firm represents MRRV Investments, LLC ("MRRV") and RCM Settlements Inc. ("RCM") (collectively, "Insured Parties") in connection with claims they have lodged with your client Synergy Captive Strategies, LLC ("Synergy") relating to the captives Professional Rx Indemnity, Inc., Modern Rx Indemnity, Inc., Sunrise Indemnity, Inc., and Strandview Enterprises Indemnity, Inc. (collectively, "Captives").

I write in response to Mr. Gelhaar's letters dated April 27, 2023, whereby Synergy communicated its denial of my clients' claims. This letter contains a rebuttal of the key points and arguments offered by Synergy in support of the said denial, most of which we find to be spurious and not offered in good faith, to say the least.

First and foremost, my clients reject, in the strongest possible terms, Synergy's suggestion that they were in any way involved in, aware of, or on notice of the Beasley Ponzi scheme before it became public knowledge. My clients were innocent victims of the Ponzi scheme who, along with nearly one thousand other unsuspecting parties, made significant investments in the Beasley Program in increasing amounts over time with the good faith expectation of a return on their investment. That investment has never been recouped.

My clients willingly filed reports with the FBI and with police departments in the State of Nevada to report their status as victims. That they are, in fact, victims

ENENSTEIN PHAM GLASS & RABBAT LLP
*March 27, 2024*
*Page 2*

has been validated by both the FBI and SEC. Simply stated, there is not a shred of evidence supporting Synergy's allegations that my clients were aware of the fraud in advance of the public, and any denial of coverage predicated on such an allegation is completely unacceptable and lacking in factual and legal support.

Synergy's No Coverage Position

Consistent with the foregoing, at all relevant times during the terms of the policies, my clients unequivocally believed that the Purchase Agreements they received were legitimate. Just as importantly, Synergy's underwriters and representatives believed the Purchase Agreements to be legitimate because had they believed or suspected otherwise, they presumably would not have permitted insurance coverage to issue or to continue. In this respect, Mr. Gelhaar's letter utterly fails to recognize or address the fact that the documents in question, including executed and non-executed Purchase Agreements that were provided periodically to my clients, were <u>also</u> provided to Synergy's underwriters and personnel, including Amerisk (which performed underwriting studies), Keith Langlands and Justin Spiegel (Synergy's administrators), and Andy Rennick (Synergy's attorney). The Purchase Agreements were deemed to meet all necessary requirements to produce valid insurance coverage, and no objections or questions about them were ever raised by Synergy or its representatives before, during, or after issuance of the policies.

Moreover, the mere fact of Beasley's Ponzi scheme having resulted in a lack of substance underlying the Purchase Agreements does not, in and of itself, invalidate or render the Purchase Agreements unenforceable as to my unsuspecting clients. My clients did not simply lose their rights under the Purchase Agreements—inclusive of damages for their breach, and insurance proceeds covering the same—simply because the other party to the agreements turned out to be a fraudster and factually unable to deliver what was represented and promised.

The fact that Synergy now, in hindsight, appears to be asserting that there was simply never any insurable interest is wildly inconsistent with Synergy's issuance of the policies in the first place, substantial premiums that my clients paid out of pocket for the policies, and Synergy's failure to raise even a single, solitary question or objection about anything at any point in time prior to the collapse of the Ponzi scheme. Should this matter proceed to litigation, it is my fervent opinion that Synergy will be hard pressed to sell that position in court.

Per Occurrence Limit

We likewise dispute Synergy's assertion that, assuming coverage exists, the alleged losses for each policy would be limited to the per occurrence limit of liability ($100,000) for several reasons.

ENENSTEIN PHAM GLASS & RABBAT LLP
*March 27, 2024*
*Page 3*

First, each Purchase Agreement was entered into as a wholly separate transaction and was represented as such in the underwriting of the policies. This fact was confirmed by Synergy's own administrators, underwriters, and representatives, who, on multiple occasions during the insuring process, specifically represented and stated that the various Purchase Agreements would be deemed to constitute separate transactions, occurrences, facts, and/or circumstances. Representatives of my clients can testify that they specifically asked questions on this exact topic and received assurances from Synergy that directly contradict the position now being asserted by Synergy.

That Synergy never intended to consider all Purchase Agreements to have arisen from a common occurrence until after my clients' claims were made is further established by information contained in the risk premium study that was performed by Synergy's underwriters. In that study (consistent with the way the policies were negotiated and presented all along), losses were intended to be incurred in $100,000 tranches, with each insurance captive to take the first $250,000 per $1 million in losses annually. Additionally, as discussed before and after the claim event with a Synergy representative, the annual insurance premium was set at 6% of the aggregate coverage amount for each policy, which makes it especially absurd for Synergy to argue that the Insureds (or Synergy) ever intended or agreed that the potential recovery under each policy would be capped at $100,000. Under Synergy's rationale, the Insureds paid $180,000 in premiums for $100,000 worth of policy coverage, in addition to having essentially a $250,000 deductible on a $100,000 loss, which is at best ridiculous or at worst fraud.

Additionally, as Synergy is well aware, each Purchase Agreement purported on its face to cover a separate injury case (i.e., occurrence), which was distinct, individual, and not related to any other cases. The facts and circumstances of the injury outlined in each Purchase Agreement were varied. Some were slip and fall cases; others were other kinds of accidents. Injuries were purported to have been sustained by unrelated parties at entirely different times and in entirely different places. Different cases reflected different law firms and different lawyers pursuing the injury claims (entailing inherently differing approaches, differing experience levels, differing levels of competence, etc.).

For those reasons, there is simply no reasonable basis supporting Synergy's attempt to construe every Purchase Agreement as part of a single, common occurrence.

<u>Exclusions</u>

I next turn to the various exclusions on which Synergy purports to rely as

ENENSTEIN PHAM GLASS & RABBAT LLP
*March 27, 2024*
*Page 4*

additional bases for denial of coverage. As to first of those exclusions under Paragraph VI.A., there were absolutely no applicable actions taken by my clients that could reasonably have been expected to cause the Covered Losses incurred.

More specifically, and contrary to Synergy's conclusory and unsupported allegations:

(1) The limits stated in the PPM (or Subscription Agreement) were established at the initial amount invested. Addendums to the PPM / Subscription Agreement were then added as additional investment tranches took places. At no time did my clients ever invest in excess of the stated PPM amount. My clients inform me that they have previously provided Synergy with documentation to establish this indisputable fact. We can provide the said documentation again if necessary.

(2) There was no indication of fraud at the time my clients were investing in the Beasley Program. Synergy's bald assertion that my clients invested after "a reasonable person would realize the program was fraudulent" is belied by the fact that nearly 1,000 investors (many of them presumably reasonable) were defrauded and had absolutely no recognition that a Ponzi scheme was taking place until it became public knowledge in early March 2022. The assertion is further belied by the fact of Synergy's own underwriters, representatives, and administrators having reviewed all of the paperwork and offerings without expressing any concerns whatsoever about the underlying program.

(3) The timing of the Assignments and Addendum being "in close proximity" to the time of the Ponzi scheme collapse is utterly irrelevant because (i) an addendum was provided every time there was further investment into the program (i.e., the final instance that occurred right before the exposure of the fraud was not unique); (ii) any Assignments that occurred were discussed with Synergy's administrators and representatives and expressly authorized and discussed before and after the loss (and in any event are not suggestive by any stretch of the imagination of any connection on the part of my clients to the fraud); and (iii) my clients indisputably continued to invest millions of dollars out of pocket into the program right up until the very end and collapse of the scheme.

As to Synergy's cited exclusion under Paragraph VI.B., the efforts made to broaden the term "litigant" that occurred in 2021 before the Initial Effective Date of the final two policies cannot be credibly construed as "showing awareness" of the fraud, as the change was undertaken jointly with Synergy and its representatives, administrators, and legal counsel, upon a periodic review of the policy, in order to more closely align the definition of the term with the reality of the Purchase Agreements and the risk sought to be mitigated by the policies. The notion that my clients' involvement in that minor tweaking of a single definition was somehow

ENENSTEIN PHAM GLASS & RABBAT LLP
*March 27, 2024*
*Page 5*

motivated by and/or reflective of their advance awareness of the Ponzi scheme is ridiculous on its face in light of the mountain of evidence proving otherwise.

Synergy's arguments suggesting that my clients made improper and unauthorized Assignments are likewise baseless. Any and all Assignments that occurred as between my clients were disclosed and discussed openly with Synergy representatives, and Synergy representatives expressly authorized them. In any event, the assignment provisions of the policies at issue do not form a valid basis for the stated denial of coverage.

Finally, Synergy's suggestion that it would be entitled to void the policies based on unspecified "observed anomalies" constituting "fraud, misrepresentation, or concealment with respect to information provided" is lacking in any kind of factual or evidentiary support, and we unequivocally deny that any basis exists for that position.

Conclusion

Based upon the foregoing, it is our belief that Synergy's denial of the Insured Parties' claims is not justifiable under the relevant facts or the policies in question, and is not in good faith.

Additionally, even independently of the claims made under the policies, Synergy bears a significant degree of liability for my clients' losses due to the fact that my clients never would have made the level of investments they did but for Synergy's ongoing review of the risks involved and corresponding issuance of the policies in question—and the protection my clients believed they had under the policies. In short, there is a very real insurer moral hazard at issue here, and Synergy's failure and refusal to take any responsibility whatsoever is outrageous and unacceptable.

Accordingly, demand is hereby made that, within twenty-one (21) days of the date of this letter, you notify us of Synergy's intention to approve MRRV and RCM's claims and pay out the aggregate limits of each of their insurance policies, which we calculate to total $13.5 million. If Synergy refuses this demand, or if we do not hear from you within the stated timeframe, I will have no choice but to advise my clients that they commence litigation to resolve this matter.

. . .

. . .

. . .

ENENSTEIN PHAM GLASS & RABBAT LLP
*March 27, 2024*
*Page 6*

      Please feel free to reach out to me if you wish to discuss this matter further. We look forward to your prompt response.

                Sincerely,

                HEATON FONTANO, LTD.

                *Jonathan W. Heaton*

                Jonathan W. Heaton